No. 9249.

GARCIA v. THE PEOPLE.

1. CRIMINAL LAW—*Evidence*—Dying Declaration. The victim of the accused being conscious of impending death, and the wounds manifestly mortal, her dying declaration was held properly received.

2. —— *Murder or Manslaughter.* If the husband takes the life of his spouse on mere suspicion, or even a just conviction, of prior acts of adultery on her part, his crime is murder and not manslaughter.

*Error to the Conejos District Court, Hon. Jesse C. Wiley, Judge.*

Mr. E. S. COUNSELLOR, Mr. JAMES D. PILCHER, and Mr. ALBERT L. MOSES, for plaintiff in error.

Mr. LESLIE E. HUBBARD, Attorney General, Mr. CHARLES ROACH, Miss CLARA RUTH MOZZER, Assistant Attorneys, General for The People.

Mr. Justice Scott delivered the opinion of the court.

THE plaintiff in error was convicted of the murder of his wife. His crime was fixed at murder in the second degree, and he was sentenced accordingly. There are two assignments of error important to consider. The first is the admission in evidence of the dying statement of the deceased, and the second relates to the refusal by the court to give an instruction tendered.

It appears that the time of the homicide, the accused and his wife were living separate and apart from each other, and that a suit by the accused for divorce was then pending. The shooting occurred on the evening of April 9th, 1916, at about eight o'clock, and at the home of deceased.

Her death occurred as a result of the shooting, on the morning of April 25th, 1916.

The dying statement was made the day following the shooting. The record does not disclose that any other person aside from defendant and the deceased wife, witnessed the shooting. The dying statement is as follows:

"I, Maximiana Lobato de Garcia, make this, my dying declaration, being on the point of death and not expecting to live: I was at home yesterday afternoon between seven and eight in the evening. The children were outside—my two children. Leofredo Garcia came to the door—to the step before the door. The little girl cried, 'There comes my papa now.' I opened the door and he came in right away. When he was going in he leaned against the door and I noticed he had a pistol in his back pocket on the right side. He came to the middle of the room, and he says to the children, speaking to the boy, 'Is that you, Leo?' and he says to the girl, 'Is that you, Adelina?' I was standing inside the room on the right side of the door when I heard him talk that way to the kids. I says, 'What is the matter with you?' When I said that I walked about two or three steps toward him, and he stuck his hand in his pocket where he had the pistol. Then I took the boy inside the door of the same room and tried to go out, carrying the child in my arms and walking backwards. I went out of the room with the baby in my arms and walking backwards. He went out after me and stood at the door with the pistol in his hand and told me, 'Turn the boy loose.' I went outside, and walking backwards, went towards the west. He followed me, trying to get behind me—I was facing him all the time. About three feet in front of the electric light pole in front of the door he came up to me in front of me, as if trying to take the child away from me. There he throwed his right arm over my shoulder and turned me with my face towards the north. He caught hold of me by my shoulder or by the sleeve, I don't remember which, and pushed me. There it was he shot at me the first time, hitting me in the back on the left side. I fell then and dropped the child. I felt

wounded and I took hold of my left hand with my right hand and raised it. I came running all the road, taking hold of my arm. About eight or nine yards from where he gave me the first shot when he shot me on the left leg below the knee near the shoe. Afterwards I heard two more shots, but I do not know where. That is all—I came into Mrs. Dubor's and told them to phone to the doctor and to the marshal. He had threatened to kill me and the children before—one time it was Nov. 9.

                    (Signed) Maximiana Lobato de Garcia.
     Witness:
          Henry F. Jordan,
          Amarante Lopez."

The deputy district attorney, who took the statement, testified:

"Q. Is it your language or the language of the deceased? A. It is the language of the deceased.

Q. How did you happen to go there to get this statement? A. I went there for that purpose.

Q. You suggested that to her, did you? A. No, sir, I asked her if she wished to make any statement. She looked to me like she was sick, and her words were—I asked her if she desired to make a statement, and she said she did, she said to me that she was going to die, and was not going to live; that was not a suggestion on my part. As a matter of fact, she didn't die for fifteen days after making the statement, but she told me she was going to die."

The attending physician testified as to the character of the wounds and as to the fatality of the same as follows:

"On the 9th day of April, last year, I was called to the home of Mrs. Marcus, in Antonito, across the tracks, and found Mrs. Garcia standing in the front room with blood streaming down the front of her body and the back, and she was in a very nervous condition. I made an examination of the wounds and found a gunshot wound, apparently entering below the shoulder blade behind and emerging in front under the collar bone; in the leg, a gunshot wound, entering above the heel about the midline, and emerging

from the outside of the leg, I think somewhat below the media. The first wound passed through the skin, the fat, the muscles of the back and chest, either through the lung, through the pleura in front, either through or between the ribs in front, through the muscles, fat and skin.

This would cut blood vessels of large size. I continued to attend the deceased until her death, which occurred on the morning of April 25, 1916, at about 7:00 o'clock."

We think that under this state of facts, the court did not err in the admission of the dying statement. This question has been considered many times by this court and the rule is perhaps more clearly and concisely stated in *Brennan v. The People*, 37 Colo. 256, 86 Pac. 79, than in any other, where it was said:

"In order to render a dying declaration admissible in evidence, the declarant must, at the time of making the same, be conscious of impending death, and without hope of recovery. This may be shown not only by what the injured person said, but by his condition and the nature and extent of his wounds. Whether, from all the circumstances under which the statement was made, it satisfactorily appears that it was made under a sense of impending death is a question exclusively for the court. We think, considering the statement of Mrs. Lowney, that she believed she was in a dying condition and about to die, and from the mortal nature of her injuries she was aware of the near approach of death, and consequently her statement was made under that sense of impending dissolution that leads to a belief in its truth, and that the court properly admitted it in evidence."

Mrs. Garcia stated in the presence of several witnesses that she was going to die. The wound was quite apparently mortal. There is no suggestion that either deceased or any other person, at the time or afterward, had any hope that she might live.

The instruction tendered by the defendant and refused by that court is as follows:

"You are instructed, gentlemen of the jury, that if a

husband discovers his wife in the act of sexual intercourse with another, or discovers them together in such a position, or under such circumstances as to indicate with reasonable certainty to a rational mind that they are just then committing, or are about to commit, or had just committed, an adulterous act, and, enraged and humiliated for the wrong, kills in the heat of passion either the woman or her paramour, the homicide, on account of the grievious nature of the provocation, is manslaughter only."

This court has made no broader statement of the law in this respect than in *Jones v. People,* 23 Colo. 276, 47 Pac. 275, where it was said, "that the killing of an adulterer, deliberately, and upon revenge, is murder; but where a man finds another in the act of adultery with his wife, and kills him or her in that transport of passion, he is only guilty of manslaughter," and the court so instructed in this case.

But if we were to admit the instruction tendered as a correct statement of the law in the abstract, the testimony did not require that it should be given in this case.

There was no testimony offered tending to show that the defendant found the wife in the act of adultery, or that he discovered her with another man in such a position, or under such circumstances as to indicate with reasonable certainty to a rational mind that they were just committing, or were about to commit, or had just committed an adulterous act.

Sufficient appears from the record to make it probable that theretofore the defendant had information to justify a suspicion, if not a conviction, that his wife had, prior to the time in question, maintained illicit relations with Quintana. But it is well settled that suspicion, or even knowledge, of prior acts of adultery are not sufficient to reduce the offense to one of manslaughter.

The judgment is affirmed.

*En banc.*

Mr. Justice White and Mr. Justice Teller dissent.

Decided January 7, A. D. 1918.  Rehearing denied April 1, A. D. 1918.